Gerard E. LICCIARDI, Plaintiff,

v.

**KROPP FORGE DIVISION EMPLOY-EES' RETIREMENT PLAN and Lone Star Forge Company, Defendants.**

No. 91 C 4516.

United States District Court,
N.D. Illinois, N.D.

June 19, 1992.

William J. Cooney, Geoffrey G. Gilbert, Lynne Mapes–Riordan, McBride, Baker & Coles, Chicago, Ill., for plaintiff.

Leonard S. Shiflett, Wilson & McIlvaine, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Gerard Licciardi ("Licciardi") receives a monthly pension payment based on his peak average earnings while employed. In calculating that average, Kropp Forge Division Employees' Retirement Plan (the "Plan") and Lone Star Forge Company ("Lone Star") excluded a large lump-sum cash payment that had been made to Licciardi in settlement of claims against his employer (a company unrelated to Lone Star) at the time of Licciardi's departure. Licciardi contends that the exclusion violates the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1145.[1]

■ Now Licciardi has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Licciardi's

motion is denied. And because the grounds for denial demonstrate that Licciardi must lose on the merits as a matter of law, this Court sua sponte grants judgment for defendants and dismisses this action.

### Facts [2]

Licciardi started working for Anadite, Inc. ("Anadite") in 1951 as an hourly employee at the bottom of the company's wage scale. He rose to the top, eventually serving as Anadite's president and chief operating officer until a falling-out with the board of directors caused his departure on November 10, 1979.

Licciardi's termination arrangements were memorialized in a six-page "Omnibus Agreement" (Licciardi Ex. A, the "Agreement"). In relevant part the Agreement read (emphasis added):

. WHEREAS, Licciardi has claimed that his past services to the Company have earned him the right to receive substantial compensation above and beyond that previously paid to him, a claim which is in dispute but which the Company believes should, in its best interest, be resolved as set forth herein; and

WHEREAS, Licciardi and several other directors and shareholders of the Company are in substantial disagreement and are deadlocked with respect to the future management and operation of the Company, and are in dispute with respect to defining the rights and obligations of and between the parties, which the parties agree necessitates severing the employ-

---

1. Further citations to ERISA will take the form "Section—," referring to Title 29's numbering and not to ERISA's internal section numbers.

2. Rule 56 requires this Court to rule in favor of Licciardi as the moving party if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." For that purpose a "genuine" issue exists when the record contains evidence sufficient to persuade a reasonable factfinder to adopt the view of either party (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1304

(7th Cir.1991)), while a "material" fact is one that would prove outcome-determinative under the substantive law (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)). Rule 56 principles require Licciardi as movant to establish the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). In the evaluation process as to whether he has met that burden, all "reasonable inferences, not every conceivable inference" must be drawn in favor of Lone Star as the nonmovant (*De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

ment relationship between the Company and Licciardi; and

\*     \*     \*     \*     \*     \*

4.  *Cash Payment.* On the date hereof, Anadite shall pay to Licciardi the sum of $650,000 in settlement of Licciardi's claim with respect to his right to additional compensation for past services rendered and with respect to an alleged obligation to issue shares of its common stock to Licciardi as past due compensation.

\*     \*     \*     \*     \*     \*

7.  *General Mutual Release.* The Company and Licciardi have concurrently herewith released each other from certain obligations by a General Mutual Release.

8.  *Tax Treatment.* The Company acknowledges that the payments to Licciardi under the consulting agreement[3] and the aforesaid $650,000 payment are *compensation for services rendered and to be rendered to the Company,* and will be so reported by the Company on its federal and state income tax returns. The Company further acknowledges that the payment to Licciardi for the purchase of 44,756 shares of the Company's common stock is a capital payment for the retirement or repurchase of capital stock and will be so treated by the Company in its federal and state income tax returns.

In the General Mutual Release ("Release") referred to at Agreement ¶ 7,[4] the parties stopped just short of barring themselves, their families, their best friends and

the Mormon Tabernacle Choir from ever suing anybody for any reason.[5] Here is the relevant belt-and-suspenders language:

1.  Except for the rights, powers, privileges, duties, liabilities and obligations created by or arising out of this Mutual General Release and ... the Omnibus Agreement and all other related documents entered into by and between the parties hereto and concurrently herewith, Anadite and Licciardi, and each of them, hereby release and absolutely and forever discharge the other of and from any and all claims, demands, damages, debts, liabilities, accounts, obligations, costs, expenses, liens, actions and causes of action of every kind and nature whatsoever, whether now known or unknown, suspected or unsuspected ... which any of the parties ever had, now has or may hereafter have against the other, by reason of any act, contract, omission, event, services rendered or transaction whenever occurring or existing at any time whatsoever to and including the date hereof.

\*     \*     \*     \*     \*     \*

3.  It is the intention of Anadite and of Licciardi, and each of them, in executing this Mutual General Release that it shall be a full and final release of each and every Released Matter. Each party hereto agrees that this Mutual General Release extends to all claims of every kind and nature whatsoever, known or unknown, suspected or unsuspected. Anadite and Licciardi, and each of them,

---

3.  [Footnote by this Court] Through a separate agreement referred to at Agreement ¶ 2, Licciardi agreed to serve as a consultant to Anadite in the future.

4.  As discussed later in the text, the Release is not only the single most critical document in the case, but it actually proves fully dispositive of the issues. Yet neither party furnished that document to this Court, either as a pleading exhibit or in conjunction with the current Rule 56 motion, though the Agreement itself (without the Release) was tendered as Exhibit A to Licciardi's motion. In fact it was not until, in the course of preparing the draft of a proposed opinion for this Court's consideration and rewriting, this Court's law clerk uncovered our Court of Appeals' decision in the *Fair* case that

is cited and discussed later in the text that the potential relevance of a release (if one existed) became so apparent. At that point this Court, in the course of reviewing and revising the draft opinion, of course reviewed the Agreement for that purpose and noted both its reference to the Release and the absence of that document from the parties' submissions. That in turn prompted a request for delivery of the document, which Licciardi's counsel were good enough to comply with immediately.

5.  That is hardly surprising. Careful lawyers drafting documents to reflect the settlement of disputes regularly include the most sweeping form of release to prevent just such unpleasant future surprises as defendants have had to confront in this action.

acknowledge that they are aware that they may hereafter discover facts in addition to or different from those which they know or believe to be true with respect to the subject matter of this Release, but that it is their intention hereby to fully and finally settle and release all Released Matters, disputes and differences, known or unknown, suspected or unsuspected, which now exist, may exist or may heretofore have existed between them and, in furtherance of such intention, the releases herein shall be and remain in effect as full and complete general releases notwithstanding the discovery or existence of any additional or different facts. ·

\* \* \* \* \* \*

6. This Release shall be binding upon and inure to the benefit of the respective heirs, successors, predecessors, assigns, officers, directors, shareholders, employees and agents of the parties hereto to the extent permitted by law.

In compliance with Agreement ¶ 8, Anadite did in fact treat the $650,000 payment as compensation for tax purposes. It withheld state and local income taxes from payment (Licciardi Ex. B) and included the payment on Licciardi's W–2 form for 1979 under the heading "Wages, tips, other compensation" (Licciardi Ex. C). Nothing in the Agreement spoke to the question whether the $650,000 payment would also be treated as compensation for purposes of calculating Licciardi's pension benefits.

When he left Anadite in 1979 Licciardi was a fully vested participant in the Plan,[6] eligible to receive pension payments as of October 1, 1990 (Licciardi 12(m) ¶ 6; Lone Star 12(n) ¶ 6 [7]). Plan § 1.2(a)(1) then specified [8] that each monthly payment would equal 1% of Licciardi's "average monthly

earnings" multiplied by his years of service (Complaint Ex. A).[9] Plan § 1.10 defined "Earnings" as (emphasis added):

> the total amount of *wages* paid to a Participant by the Company, including any overtime pay, commissions, bonus payments, and *any other additions to or deductions from regular compensation.*

Plan § 1.5 defined "Average Monthly Earnings" to mean, in relevant part:

> one-sixtieth of the Participant's Earnings for the 5 consecutive calendar years of his employment with the Company for which the amount of Earnings paid to the Participant during his employment with the Company was the largest.

In 1982 and again in 1983 Licciardi asked Anadite to confirm the amount of the monthly payments that he would eventually receive. Anadite replied that he would receive $3,246.88 per month, a figure based on Average Monthly Earnings from 1975 to 1979—excluding, however, the $650,000 payment from the amount of compensation for 1979 (Mayle Decl.Ex. B). Licciardi protested the exclusion in a conversation with Tom Freborg, an Anadite executive. Freborg told him that any "accounting error" could be corrected "any time" (Licciardi Dep. 61–62).

In 1987 Anadite sold certain property and assets of its Kropp Forge Division to Lone Star. As part of the transaction Lone Star became successor sponsor of the Plan (Lone Star 12(n) ¶¶ 17–18). It also became entitled to convert to its own use any Plan assets not needed to satisfy the Plan's obligations (*id.* ¶ 19). Lone Star believed that the Plan was overfunded, a belief based in part on the projections that Anadite had shared with Licciardi in 1982 and 1983 (*id.* ¶ 20).

---

6. Kropp Forge Division, whose name the Plan bore, was a subsidiary of Anadite.

7. Each party has filed the factual statements required by this District Court's General Rule 12(m) and (n). Licciardi's initial statement is cited as "Licciardi 12(m)" and Lone Star's responsive statement as "Lone Star 12(n)".

8. At the time of Licciardi's departure the original 1974 version of the Plan created by Anadite

was in effect. On October 31, 1985 a restated version of the Plan took effect (Licciardi 12(m) ¶ 3).

9. *This definition and the others in this paragraph are excerpted from the original 1974 version of the Plan. All these definitions remained substantively identical in the 1985 version (Lone Star 12(n) ¶ 8).*

Once the acquisition was complete, Lone Star froze and terminated the Plan. It then received the overfunding (*id.* ¶ 21). To satisfy its obligations to Licciardi and other vested beneficiaries of the Plan, Lone Star purchased annuity contracts through Principal Insurance Company ("Principal") (Complaint Ex. H). In September 1990 Licciardi received a notice from Principal of his impending receipt of benefits. He replied by formally protesting the exclusion of the $650,000 payment from his pension calculation. Principal rejected Licciardi's protest on November 7, 1990. Licciardi then appealed to Lone Star, which rejected the claim on May 24, 1991 (Licciardi 12(m) ¶ 12).

Treatment of the $650,000 payment as "compensation" for pension purposes would roughly double Licciardi's monthly payments (Lone Star 12(n) ¶ 22). In that calculation Lone Star apparently assumes that the entire payment would be attributed to the year 1979 or at least to the 1975–79 period, with no deduction for the fact that Licciardi alleges he was owed money for his 1972–74 services as well as for the later period (Lone Star Ex. 3 at 9).

### Procedural Background

Licciardi filed this lawsuit on July 18, 1991, charging breaches of ERISA in general and of Section 1132(a)(1)(B) in particular (Complaint ¶ 1).[10] Lone Star, acting in its individual capacity rather than as Plan administrator, then moved to dismiss. It argued that an action to recover benefits under Section 1132(a)(1)(B) may be brought against the Plan but not against Lone Star itself.

This Court rejected Lone Star's motion in an opinion reported at 772 F.Supp. 1069 (N.D.Ill.1991). Under Section 16.5 of the 1987 amendment to the Plan, Lone Star stepped into Anadite's shoes as a Plan fiduciary. When it took that step Lone Star became potentially liable for any breach of fiduciary duty under Sections 1105 or 1109—in this case, for pocketing the pro-

ceeds of the Plan overfunding while allegedly denying Licciardi the full benefits owed to him. Because the facts alleged in the Complaint supported that theory of liability, it did not matter that Licciardi failed to cite the particular statutory sections (772 F.Supp. at 1071).

Licciardi then moved for summary judgment against both defendants. His motion is fully briefed and ripe for decision. Acting both for itself and as administrator of the Plan, Lone Star has also filed a motion for summary judgment on all claims of breach of fiduciary duty. Briefing on that motion has been deferred pending resolution of Licciardi's motion.

### Release of Claims: the *Fair* Doctrine

This case is controlled by the application of *Fair v. International Flavors & Fragrances, Inc.*, 905 F.2d 1114 (7th Cir.1990) (a case that the parties did not cite) to the Release (a document that the parties evidently thought was insignificant). To see why that is so, a brief description of *Fair*'s facts and holding is in order.

In that case another unhappy employee, Mildred Fair ("Fair"), settled a discrimination lawsuit against her employer ("IFF") in exchange for an $85,000 payment. Fair also received the promise of a pseudo-salary for the year and a half to come before she was eligible for retirement. In fact Fair agreed not to work for the company again.

Fair's settlement contract did not mention the pension treatment of the $85,000 payment. Nor did the contract's general release provisions refer to pension issues, though the release did impose a broad bar on any future claims "relating to her employment relationship with IFF, except as may be necessary to enforce the terms of this Settlement Agreement" (*id.* at 1114). Fair later sued IFF when she learned that the settlement payment would not be included in her pension calculation. She alleged breach of contract and a violation of ERISA.

---

**10.** There is of course no dispute as to the Plan being an "employee benefit plan" within the meaning of Sections 1002 and 1132(d)(1).

First our Court of Appeals concluded that the release barred Fair's contract claim. Every release, Judge Cudahy wrote for the court, governs claims that the plaintiff knew or should have known at the time the release was executed. Under the circumstances Fair knew or should have known that her pension benefits were at stake and that IFF had not agreed to incorporate the settlement payment into those benefits (*id.* at 1116 (footnote omitted)):

> In essence, the parties traded money for Fair's promise to leave immediately (and, of course to withdraw the suit); given the nature of this trade—specifically, the fact that the Settlement Agreement did not reinstitute the working relationship between IFF and Fair (aside from the payment of salary and a nominal title)— the parties certainly should have been aware of any impact the Settlement Agreement might have upon Fair's impending retirement benefits.

Accordingly Fair was seen as trying to expand the terms of the settlement (which the release forbade) rather than as trying to enforce the settlement (which the release would have permitted) (*id.*):

> The plain language of the Settlement Agreement precludes Fair from bringing suit against IFF on any claim arising from her employment relationship with IFF. The Settlement Agreement does not provide that IFF must consider the $85,000 Settlement Payment to be part of her monthly compensation for purposes of her pension; Fair's attempts to add that language now are unavailing.

Next the court rejected Fair's ERISA claim without reaching its merits, holding

that it too was barred by the release (*id.* at 1117);

> Whether Fair's suit to include the $85,000 Settlement Payment in her compensation (used to calculate pension benefits) is characterized as a suit based upon the Settlement Agreement or ERISA, it still constitutes a claim "arising from any matter relating to her employment relationship with IFF," and is therefore covered by the covenant not to sue.[11]

That dual holding resulted in Fair's total defeat.

Licciardi has not sued here for breach of contract,[12] but *Fair* does not require him to do so. If Fair had framed her complaint solely in ERISA terms, the substance of the dispute would have been identical and the court would have analyzed it the same way.

Licciardi's ERISA claim, like Fair's, is really predicated on a breach of contract theory. Licciardi argues that the foundation of his ERISA claim lies in the declaration of Agreement ¶ 8 that the $650,000 payment represented "compensation for services rendered ... to the Company." Exclusion of the payment from his pension allegedly violated that contractual definition (Licciardi R.Mem. 5). Evaluation of the claim, then, requires analysis of the Agreement—but first a brief survey of the operative standards for that analysis.

### Principles of Contract Interpretation

■■■ Agreement ¶ 11 dictates that Illinois contract law shall govern the resolution of any dispute over the meaning of the Agreement.[13] Illinois cases track the fa-

---

11. [Footnote by this Court] *Fair's* logic applies equally to a "covenant not to sue," which extinguishes one signatory's right to sue another signatory (*Batteast v. Wyeth Laboratories, Inc.* 137 Ill.2d 175, 182, 148 Ill.Dec. 13, 16, 560 N.E.2d 315, 318 (1990)), and to a "release," which extinguishes a cause or causes of action against the released parties and any joint tortfeasors. What Anadite and Licciardi executed was a release both in name and in substance.

12. Such a state-law claim would likely be cognizable under the federal courts' supplemental jurisdiction (28 U.S.C. § 1367) or perhaps under diversity jurisdiction (28 U.S.C. § 1332). Com-

plaint ¶¶ 2–4 suggest that diversity is probably present here, although it is not established on the face of the Complaint in its present form. ERISA ordinarily preempts all breach of contract claims (*Smith v. Blue Cross & Blue Shield United*, 959 F.2d 655, 657 (7th Cir.1992)). But *Fair* appears to carve out a potential exception to preemption for cases of this kind.

13. Because the contract principles at issue are so universal and well-established, there is no point in debating the validity of the choice-of-law provision. If some other state's law or the "federal common law rules of contract interpretation" of the same type that govern ERISA

miliar common-law principles (*Farm Credit Bank v. Whitlock*, 144 Ill.2d 440, 447, 163 Ill.Dec. 510, 513, 581 N.E.2d 664, 667 (1991) (citations omitted)):

> The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law.

> A contract will be considered ambiguous if it is capable of being understood in more sense [sic] than one. Where a court determines that a contract is ambiguous, its construction is then a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended.

■ Whether the instrument is "capable of being understood in more sense than one" depends primarily on the language of the instrument alone—a concept ordinarily referred to as "internal" or "intrinsic" ambiguity (*FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir.1989), applying Illinois law). Illinois also employs the doctrine of "extrinsic" or "latent" ambiguity, which comes into play (*Hoglund v. State Farm Mut. Auto. Ins. Co.*, 148 Ill.2d 272, 279, 170 Ill.Dec. 351, 355, 592 N.E.2d 1031, 1035 (1992), quoting Black's Law Dictionary ["Black's"] 102 (3d ed. 1933))

> where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings.[14]

■ *Daiwa Bank, Ltd. v. La Salle Nat'l Trust, N.A.*, 229 Ill.App.3d 366, 379, 170 Ill.Dec. 563, 571, 593 N.E.2d 105, 113 (1992) (citations omitted) confirms the common law's traditional reluctance to rest a finding of overall intent on a single contractual phrase:

> The cardinal rule in construing a contract is to give effect to the parties' intent, and to discern this intent the various contract provisions must be considered as a

whole. Since words derive meaning from the context in which they occur, each part of a contract must be viewed in light of the other parts. Similarly, we think that individual provisions of a contract are properly understood only by examining the entire provision rather than selected phrases.

Illinois also applies the familiar doctrine that (*Shorr Paper Products, Inc. v. Aurora Elevator, Inc.*, 198 Ill.App.3d 9, 13, 144 Ill.Dec. 376, 378, 555 N.E.2d 735, 737 (2d Dist.1990)):

> In interpreting a contract, it is presumed that all provisions were intended for a purpose, and conflicting provisions will be reconciled if possible so as to give effect to all of the contract's provisions.

What remains now is to apply those principles to the Agreement.

## Analysis of the Agreement

■ This opinion has already quoted in full the relevant portions of the Agreement: two of the six "Whereas" clauses and Paragraphs 4 and 8 from the main text. In the first of the quoted "Whereas" clauses, the parties agreed that Licciardi's claim for past-due compensation remains "in dispute[.]" But they also agreed that Anadite found the settlement of the claim "in its best interest" (Agreement at 1). That language—typical of the drafting of settlement agreements—makes it clear that Anadite never intended to, and never did, admit that it had actually been liable to Licciardi for the $650,000.

In the second "Whereas" clause the parties specified that Licciardi was not leaving Anadite via planned retirement or even an amicable parting of the ways. Instead his departure stemmed from "substantial disagreement and ... deadlock[ ]" over the company's future plans (Agreement at 2). That clause established that the parties' overarching purpose was to cut the ties

---

plans and insurance policies (*Hammond v. Fidelity & Guaranty Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir.1992)) were held to apply, nothing in the analysis would change.

**14.** [Footnote by this Court] That 1933 definition remains the same today (Black's 80 (6th ed. 1990)).

between them—not to resolve the merits of their disputes.

In the body of the contract (Agreement ¶ 4 (emphasis added)) the parties then agreed that Anadite would make the $650,000 payment:

> in settlement of Licciardi's claim with respect to his right to additional compensation for past services rendered and with respect to an alleged obligation to issue shares of its common stock to Licciardi as past due compensation.

Licciardi doubtless believed that he had earned the $650,000 payment in the course of his employment—in other words, that Anadite would have been liable on a breach-of-contract claim if Anadite had not made the payment. But if he thought that the Agreement necessarily confirmed Anadite's agreement with that view, he was mistaken.

It is axiomatic that "settlements are not admissions of liability" (*Illinois State Toll Highway Auth. v. Heritage Standard Bank & Trust Co.*, 196 Ill.App.3d 5, 22, 142 Ill.Dec. 410, 423, 552 N.E.2d 1151, 1164 (2d Dist.1990)).[15] To be sure, parties may choose to contract around that general rule (see *Wilk v. American Medical Ass'n*, 895 F.2d 352, 368 (7th Cir.1990)), but if they have not done so the rule applies and no admission is found. By stipulating that the merits of Licciardi's claim remained "in dispute," and by using the words "in settlement of" in Agreement ¶ 4,[16] the parties signaled that the general rule should apply.

Next the parties agreed that both the $650,000 payment and any future consulting payments "are compensation for services rendered and to be rendered" (Agreement ¶ 8). Licciardi maintains that the phrase "compensation for services rendered" embodies a general agreement to characterize the payment as "compensation" for all purposes, including his pension.

But that isolated quotation alone does not prove the contract unambiguous and therefore susceptible only to construction in Licciardi's favor as a matter of law. For the phrase "compensation for services rendered" is like a hammock strung between two posts—one post being the general paragraph heading "Tax Treatment" and the other being the specification that Anadite would treat the payment as compensation on its tax returns. Any hammock cut from its supports is just a pile of rope. Likewise, Licciardi's favored phrase cannot be treated in a vacuum, as somehow severed from its context.

Both the expressly identified subject matter of the paragraph and then the specification teach that what comes in between should surely be construed as an agreed characterization of the payment as "compensation" for tax purposes (*Daiwa Bank*, 229 Ill.App.3d at 379, 170 Ill.Dec. at 571, 593 N.E.2d at 113, holding that "individual provisions of a contract are properly understood only by examining the entire provision rather than selected phrases"). But it does not follow inexorably that the payment is to be placed under the same rubric for a purpose never discussed (and so far as appears from the current submissions, never considered) in negotiating and drafting the Agreement.

---

**15.** Though applied here as a rule of contract interpretation, the proposition in the text is better known as an evidentiary rule. To further the public policy favoring settlement, Fed. R.Evid. 408(2) bars the admission of evidence of settlements to prove liability (*Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 423 (7th Cir.1987)). Rule 56(e) dictates that evidence inadmissible at trial is also inadmissible on summary judgment. But because Lone Star has not raised a Fed. R.Evid. 408(2) objection, this opinion does not consider whether the Agreement might arguably be inadmissible to the extent that it is really offered to prove Anadite's liability on the underlying claim for compensation.

**16.** This opinion ascribes no weight to the use of the words "alleged obligation" in Agreement ¶ 4. "Alleged" was attached in that provision only to Licciardi's claim that his past services entitled him to common stock as well as money. By contrast, the contract's reference to his money claim spoke of his "claim with respect to his right to additional compensation for past services." If the word "right" and the omission of the word "alleged" to modify it were to be emphasized, Licciardi could certainly fashion a colorable argument based on the negative inference to be drawn from the different language.

That conclusion is bolstered by Anadite's stated refusal to admit general liability that emerges from the "Whereas" clauses, from Agreement ¶ 4 and from the balance of Agreement ¶ 8 (*Shorr Paper Products*, 198 Ill.App.3d at 13, 144 Ill.Dec. at 378, 555 N.E.2d at 737 (individual terms must be construed to harmonize with contract as a whole)). It is entirely plausible for Anadite to have retained (that is, not to have given up) its pre-settlement posture that Licciardi had no right to any actual earned "compensation," while at the same time agreeing as to how the payment it was making in settlement of that disputed claim would be handled for tax purposes. It is not exactly compelling to argue, as Licciardi must, that the parties' agreement on tax treatment necessarily carried with it Anadite's surrender on the substantive claim of entitlement that it carefully said it was *not* admitting in the Agreement.[17]

Nor does the extrinsic evidence tendered by Licciardi prove his theory of the contract (though it is proper to consider such evidence, to determine whether there is "a necessity for interpretation or a choice among two or more possible meanings" despite a document's plain language (*Hoglund*, 148 Ill.2d at 279, 170 Ill.Dec. at 355, 592 N.E.2d at 1035). Licciardi points to three extrinsic facts:

1. Anadite reported the $650,000 payment on Licciardi's W–2 form for 1979 (Licciardi Aff.Ex. C). But all that shows is that the company kept the limited promise it made in Agreement ¶ 8. Such tax reporting does not inherently carry with it a broader admission that the payment represented Plan-covered compensation income for pension purposes. Nor does Licciardi argue that either tax law or ERISA law requires any payment characterized as income for tax purposes automatically to be counted under a retirement plan's formula for pension purposes.

2. In a proxy statement Anadite described the $650,000 payment as a "settlement of [Licciardi's] claim for additional compensation for past services rendered" (Licciardi Aff.Ex. D at 9).

3. In its annual report the company described the payment as "a negotiated amount for claims for prior services rendered" (*id.* Ex. E at 13).

Both the proxy statement and the annual report employ the same sort of careful phrasing ("settlement" or "negotiated amount" as to Licciardi's claim) that was used in the text of the Agreement itself to *avoid* any suggestion that Anadite—as contrasted with Licciardi—had acknowledged that the payment really constituted past due compensation. Nothing in those documents supports Licciardi's argument that Anadite ever characterized the payment as actual compensation in dealing with third parties.

Indeed, Lone Star has submitted extrinsic evidence of its own in response to Anadite's argument. Not only does that evidence reflect the absence of any discussion of pension issues in the negotiation of the Agreement, but it directly confirms Lone Star's claim that Anadite considered the payment to be a payoff rather than true earned income. Here is the relevant portion of Anadite's Board of Directors' minutes that led to approval of the settlement (Lone Star Ex. 3 at 9–10):

> At approximately 4:50 p.m., Mr. Licciardi and Mr. Cooney [Licciardi's counsel] were asked to leave so that the remaining directors could speak freely as to certain aspects of the transaction. Mr. Grossman [Anadite's counsel] then turned to the $650,000 payment for Mr. Licciardi's claim regarding past services rendered. Mr. Licciardi contended that since 1972, he had not received additional stock and other compensation to which he was entitled. Mr. Grossman noted that Mr. Licciardi had never made these claims to the Board and no reference to

---

17. Agreement ¶ 8 also describes *future* payments under the consulting agreement as "compensation for services ... to be rendered[.]" Presumably the consulting fees would constitute compensation for services actually rendered.

But that likelihood tells us nothing about the parties' intentions concerning pension treatment of the $650,000 payment. As a consultant Licciardi would not even be a participant in the pension plan.

them had ever been made in any proxy statement, although the proxy statements had been read by Mr. Licciardi. Mr. Grossman stated that he felt the proposed $650,000 was simply a negotiated amount to make the deal. The payment will be referred to in the agreements as a form of "earned compensation" so that Mr. Licciardi can claim it is subject to the maxi-tax rates for earned income. Mr. Grossman stated that in reality the $650,000 was a payment to be made to solve the management problems surrounding Mr. Licciardi. Mr. Grossman stated that each director would have to make his own decision as to whether the solving of that problem was worth the price as reflected in the agreements. Mr. Wellmuth noted that in his opinion the directors could easily justify such a price for the overall good of the Company and to end "the agony we have been through."

Licciardi points out that the tax characterization also reaped tax benefits for Anadite (Grossman Dep. 66, Licciardi R.Mem.Ex. A), a point that of course proves nothing at all about the pension dispute.

In sum, neither the language of the Agreement nor the extrinsic evidence compels a judgment for Licciardi. He has not proved a breach of Anadite's promise to him. At the most, all that can really be said in Licciardi's favor is that the Agreement may leave the pension issue open. It is unnecessary to resolve the flip side of the question—whether it would be possible to fashion a respectable argument that the text must be construed as a matter of law *against* Licciardi. What is exceedingly plain is that his Rule 56 motion must be denied.

### Impact of the Release

Ordinarily a summary judgment opinion ends once the issues presented by the moving party are decided. But it would be pointless to allow this lawsuit to continue. *Fair* compels a judgment in favor of Lone Star and the Plan.

■ By signing the Release, Licciardi agreed forever to waive "all claims of ev-

ery kind and nature whatsoever, known or unknown, suspected or unsuspected." Only one relevant exception was permitted to the parties: They could bring claims to enforce the terms of the Agreement. As the contractual analysis has just demonstrated, the Agreement said nothing at all about pension treatment, and none of the extrinsic evidence indicates that the parties ever discussed pension treatment outside the four corners of the document.

Through an aggressive interpretation of the contract and its context, a jury might conceivably conclude that the payment ought to be included in Licciardi's pension. But that very potential for a victory is what spells defeat for Licciardi. Precisely because a ruling in his favor would require that the trier of fact venture beyond the express terms of the contract and into the jungles of interpretation, this lawsuit constitutes a forbidden claim on a "known or unknown, suspected or unsuspected" matter relating to his employment relationship with Anadite. By signing the Release the parties expressly pledged to avoid any such efforts to upset the repose established by their settlement.

Like Fair, Licciardi is properly charged with actual or constructive knowledge of the parties' lack of agreement on pension treatment when they signed off on their basic disputes:

—Licciardi's bargain was fundamentally the same as Fair's. He traded money for a promise to leave the company immediately. By its very nature that trade should have put him on notice that all aspects of every dispute between him and the company ought to be resolved then and there.

—Licciardi signed a contract stipulating that the merits of his claim for past compensation remained in dispute—a sure signal that Anadite did not intend to accept any non-negotiated ancillary consequences of liability on the claim.

—As president and chief operating officer of the company, Licciardi surely knew or should have known that inclusion of such an enormous payment in the base calculation for future pension pay-

ments would impose large financial obligations that no company was likely to accept by silence.

—Because he was represented by counsel, Licciardi should have known better than to assume that pension inclusion was dictated by some background legal principle. As the discussion below will demonstrate, the only case that could support that proposition comes from another circuit, is contradicted by Seventh Circuit authority, and was decided eight years *after* Licciardi signed the Agreement.

It would be difficult to construct a more compelling parallel between the two situations.[18]

Under these circumstances, the present attempt to force inclusion of the $650,000 payment in the calculation of Licciardi's pension unquestionably constituted a "known or unknown" claim that was barred by the Release provision. Judge Cudahy's words in *Fair* could not be more apt. As they used to say on *Dragnet*, only the names have been changed—though not necessarily (as in *Dragnet*) "to protect the innocent" (*Fair*, 905 F.2d at 1116):

> The plain language of the Settlement Agreement precludes [Licciardi] from bringing suit against [Anadite or its successors] on any claim arising from [his] employment relationship with [Anadite]. The Settlement Agreement does not provide that [Anadite] must consider the [$650,000] Settlement Payment to be part of [his] monthly compensation for purposes of [his] pension; [Licciardi]'s attempts to add that language now are unavailing.

Just as that reasoning barred Fair's claims brought on both contract and ERISA theo-

ries, it bars Licciardi's claim here brought solely under ERISA.

### Default Rule Elsewhere

*Eckersley v. WGAL TV, Inc.*, 831 F.2d 1204, 1209 (3rd Cir.1987) (citation omitted) holds that an employer must include the settlement of a claim for past due compensation toward the plaintiff's pension, even if the settlement agreement includes a release clause and the employer does not concede liability on the underlying claim for compensation:

> Had the suit gone to judgment and the payment been made in satisfaction of that judgment, the payment would be treated as compensation.... If we were to [hold] that a payment in settlement of a lawsuit to enforce a claim for compensation should be treated differently than a payment on the claim, we would discourage such settlements and encourage their litigation to judgment. Such a result would be inconsistent with the strong public policy favoring pre-judgment settlements of lawsuits.

Licciardi relies heavily on *Eckersley*, and understandably so. If *Eckersley* were the law of this circuit, the inclusion of the $650,000 in calculating Licciardi's pension would be dictated as a matter of law. And the parties' silence as to pension treatment would be construed to signify their acceptance (or perhaps ignorance) of that background rule.

But unfortunately for Licciardi, in this circuit all's *Fair*. That case did not even mention *Eckersley*, suggesting that the parties simply failed to bring the Third Circuit opinion to the court's attention and that the court did not uncover *Eckersley* on its own.[19] Yet the conflict between the cases is obvious.

---

18. True enough, two factors present in *Fair* are missing here: Licciardi's pension eligibility was not imminent, as Fair's was, and the terms of Licciardi's pension plan did not clearly exclude "special payments" from the definition of compensation, as Fair's did. But Licciardi had himself exercised general supervisory authority over the Plan and was a Trustee of several Kropp Forge pension and stock incentive plans—and any difference in the precise terms of the plans in the two cases is likewise immaterial for pur-

poses of distinguishing them as to the applicability of actual or constructive notice.

19. Our Court of Appeals' Circuit Rule 40(f) requires the circulation to all of the court's active judges of any opinion that conflicts with a decision of another Court of Appeals, to inquire whether en banc consideration of the issue is desired. Whenever that procedure is followed, the opinion as issued carries a footnote to that effect. Only this week this Court, sitting by designation with our Court of Appeals, followed

*Fair* teaches that when there is no express affirmative agreement on the pension treatment of a settlement payment,[20] the existence of a broad general release bars the recipient of the settlement payment from bringing a later suit to force the inclusion of the payment in his or her pension. Licciardi's claim falls squarely within that teaching. *Eckersley* effectively deems the terms of a general release irrelevant, because it holds that the pension treatment is dictated as a matter of law. That poses a circuit split, whether or not the circuits have noticed it.[21] This Court must follow *Fair*.

A word should be said about the scope of the mute dispute between *Fair* and *Eckersley*. One might argue that *Fair*, by emphasizing the employer's plain intention to exclude the payment from the plaintiff's compensation, does not necessarily depart from the *Eckersley* background rule. But Judge Cudahy's concluding statement makes that interpretation implausible (905 F.2d at 1117):

> Had Fair insisted at the bargaining table that the Settlement Payment be included in her monthly compensation (for purposes of her pension), the nominal value of IFF's settlement offer to it presumably would have been diminished. We refuse to give Fair for free what she evidently declined to purchase at the settlement negotiations for a price.

This statement merely extends to the ERISA context the general rule that a settlement should not ordinarily carry with it the ancillary consequences of a judgment on the merits. Any reversal of that rule should be accomplished at the bargaining table, not in the courtroom.

Settlement payments may connote any number of things: a concession of liability, or a willingness to bear the nuisance value of the lawsuit, or a willingness to buy peace at a much larger price, or a desire to put controversy behind and go on to better things, to name just a few. Whatever the payment in settlement of a disputed compensation claim may really represent in any given case, *Eckersley* always requires the employer to calculate pension benefits as if 100% of the payment represented a concession of liability. Under such a regime an employer can avoid that consequence only by pursuing litigation to the bitter end in hope of a favorable judgment. *Eckersley* therefore reverses—without discussing—the policy under which the law encourages settlements by *refusing* to treat them as admissions of liability unless the parties so agree.

If it were possible to roll back the clock to delve into the question that Anadite never had to answer (even to itself), the result here would probably differ from either side's extreme position. Anadite's willingness to settle—or more accurately the figure at which it was willing to do so—very possibly reflected its recognition of some liability for Licciardi's past services in addition to its desire to get the Licciardi burr out from under its corporate saddle. To the extent that the payment represented the former element, it would be most fair to Licciardi if the eventual pension payment gave credit for that portion. But to the extent that the payment satisfied any one or more of an entire set of other mo-

that precise procedure as to an opinion that it had written and that has been approved by the other panel members—an opinion that poses a conflict with a recent Eleventh Circuit opinion that this Court, not the parties, had located (see *Akrap v. INS*, 966 F.2d 267 (7th Cir.1992 (opinion forthcoming)). *Fair* contains no such footnote.

**20.** If there were such an express agreement, of course, an action to compel performance of that agreement would be one to *enforce* the settlement agreement, thus coming within the express exception to the contemporaneous release document.

**21.** *Leavitt v. Northwestern Bell Telephone Co.*, 921 F.2d 160, 163 (8th Cir.1990) seems to side with *Fair*, holding that a general release extinguishes ERISA claims when the employer did not commit any "overreaching, exploitation or misconduct" and the employee "knowingly, voluntarily and fairly" settled the underlying dispute. Oddly enough, *Leavitt* too fails to mention the evident conflict with *Eckersley*. Perhaps the Third Circuit has invented a "stealth precedent," capable of sneaking past other courts' decisional radar.

tives, it would be most fair to Anadite (and now to Lone Star) if the pension calculation excluded that portion of the payment.

No Article III commission has been conferred on King Solomon to resolve ERISA disputes in such a fashion. Unless Congress dictates otherwise as a general rule, or unless the parties dictate otherwise in a specific case, one party must bear the entire cost of a decision one way or the other. Or to put the *Fair–Eckersley* conflict another way, the choice is between *Fair*'s reliance on freedom of contract and *Eckersley*'s treatment of ERISA as overriding the contractual doctrine that parties may release unaddressed issues that go to the ERISA plan consequences of a settlement agreement. Even if this Court were not bound by jurisprudential principles to follow the path marked out by our own Court of Appeals, it would still opt for that route as the better-reasoned one.

### Conclusion

Licciardi has not proved his entitlement to a judgment as a matter of law. Hence his Rule 56 motion is denied.

Ordinarily it would be appropriate at this point to order the submission of briefs on Lone Star's pending motion for partial summary judgment.[22] En route to denying Licciardi's motion, however, this opinion has effectively demonstrated that the Release, both by its own terms and under the mandate of *Fair*, bars any consideration of the merits of this case. Licciardi's one hope was to show that the Agreement clearly established his entitlement to a larger pension. Having failed to make that showing, he is barred by the Release from

asking a court to find defendants liable on any other theory.

Therefore the only sensible course is to direct the entry of a judgment as a matter of law in favor of Lone Star and the Plan and against Licciardi. It is so ordered, and this action is dismissed.

---

22. Among other issues that this opinion has not found it necessary to discuss (let alone resolve), it is worth noting that Lone Star negotiated the price that it was willing to pay for the Kropp Forge Division assets on the strength of what it had been told about the then-existing evaluation of the Plan's assets and actuarially determined liabilities. Thus an integral part of Lone Star's acquisition was its contemplated partial recapture of its purchase price through the prompt termination of the Plan and the consequent recovery of the amount of the Plan's overfunding. At that time Licciardi already knew of the exclu-

sion of the $650,000 payment from the calculation of his future pension, but he had decided to abide the event until his payments were due to begin—something as to which Lone Star had no notice, or any source of notice, by reason of Licciardi's inaction. Whether that scenario would give rise to Lone Star's successful defense to Licciardi's present claim under the rubric of laches or estoppel, or perhaps some other label, would form another interesting line of inquiry. But there is no need to prolong this opinion for that purpose.